# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michelle Jacobson,<br><br>        Plaintiff,<br><br>v.<br><br>County of Chisago; and Richard Duncan, both individually and in his official capacity as Sheriff of County of Chisago,<br><br>        Defendants. | Case No. 18-cv-02528 (SRN/HB)<br><br><br>**ORDER** |

Celeste E. Culberth and Leslie L. Lienemann, Culberth & Lienemann, LLP, 444 Cedar Street, Suite 1050, St. Paul, MN 55101, for Plaintiff.

Cally R. Kjellberg-Nelson and Dyan J. Ebert, Quinlivan & Hughes, PA, P.O. Box 1008, St. Cloud, MN 56302-1008, for Defendant County of Chisago.

Christopher Kent Wachtler, Wachtler Law Office, 983 Ashland Avenue, St. Paul, MN 55104, for Defendant Richard Duncan.

Kaitrin Christine Vohs and Rachel E. Bell-Munger, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1400, St. Paul, MN 55101, for Amicus Curiae Rebecca Lucero, Commissioner of the Minnesota Department of Human Rights.

Elizabeth J. Vieira and Scott T. Anderson, Rupp, Anderson, Squires & Waldspurger, 333 South Seventh Street, Suite 2800, Minneapolis, MN 55402, for Amicus Curiae Association of Minnesota Counties.

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on the Motion for Partial Summary Judgment [Doc. No. 97] filed by Plaintiff Michelle Jacobson and the Cross-Motion for Summary Judgment [Doc. No. 105] filed by Defendant County of Chisago ("Chisago"). Based on a review of

the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS in part** and **DENIES in part** both motions.

## I.     BACKGROUND

Plaintiff Michelle Jacobson began working as an Office Support Specialist for the Chisago County Sheriff's Office in July 2013. (Compl. [Doc. No. 1], at ¶ 9.[1]) Sheriff Richard Duncan was Jacobson's highest-ranking supervisor. (*Id.* ¶ 10.) Duncan was elected to his position in 2010, and was responsible for the Office's operations. (Decl. of Leslie L. Lienemann ("Lienemann Decl.") [Doc. No. 100], Ex. 3 ("Duncan Dep."), at 7, 13-14.) The Chisago County Board did not supervise Duncan or Sheriff's Office staff, but did set the Office's budget. (*Id.* at 23-24.) In addition, Duncan submitted hiring and firing recommendations to county officials for final approval, and Chisago enacted personnel policies applicable to Sheriff's Office employees. (*Id.* at 23-25, 150-56.)

Beginning in October 2017, Duncan initiated a scheme in which he wrote letters—under the pseudonym "Control Freak"—addressed to Jacobson and himself, in which "Control Freak" attempted to coerce Duncan and Jacobson into having an affair. On October 26, 2017, Duncan called Jacobson into his office, while wearing his badge and uniform, and informed her that he was attempting to restructure her position and increase her pay. (Compl. ¶ 13; Duncan Dep. at 74-75.) He then showed her a letter that he claimed to have received from "Control Freak." (Compl. ¶ 14.) Duncan testified that the letter

---

[1] The allegations in the Complaint referenced in this Section have been admitted by Defendants, unless otherwise noted. (*See* Chisago's Answer [Doc. No. 11]; Duncan's Am. Answer [Doc. No. 85].)

"stated that both me and her were being threatened, both our families basically were being threatened. No -- no explanation of what the threat might be. There was -- that we were to basically have an affair." (Duncan Dep. at 43.) Duncan wrote and printed the letter using his home computer. (*Id.* at 37.) After showing the letter to Jacobson, Duncan destroyed it in order to conceal his conduct. (*Id.* at 43, 52.) Duncan claimed that he had asked another law enforcement agency to analyze the letter for fingerprints. (Compl. ¶ 19.) But Duncan discouraged Jacobson from filing a police report, and explained to her that there was insufficient evidence for him to refer the matter to the Sheriff's Office's investigators. (Duncan Dep. at 42-43.) Instead, Duncan offered to assign an extra patrol to Jacobson's house, because "she was going to be out of town and her kids were basically home alone at that time." (*Id.* at 47.)

While Jacobson was traveling to North Dakota at the end of October, Duncan claimed to have received additional letters. (Lienemann Decl., Exs. 10, 12.) As the plot unfolded, Control Freak demanded that Jacobson and Duncan travel together to a training conference in Bemidji, Minnesota, where the two would share a hotel room with a single king-size bed and follow the directions that Control Freak would subsequently deliver in a "packet."[2] (*See id.*, Ex. 12.) Control Freak attempted to coerce Jacobson's compliance through threats to Jacobson and her family. Illustrative examples from the letters include:

I assure you that if you follow my plan, no one has to get hurt . . . .

---

[2] Duncan in fact booked a hotel room in Bemidji, and submitted a reimbursement request to Chisago. (Duncan Dep. at 47-48.)

I don't want to hurt your families so don't make me do it. . . . Just follow my plan and know you are doing the right thing for both of you. This is about protecting others and yourselves. For me, I get the joy of controlling your every move. Michelle how far would you go to protect your kids, your husband, your reputation? . . . I bet both of you don't really care about yourself but you would do anything for others or especially your kids. . . .

I can assure you that if you carry this out without no one knowing your families will be safe and no one will know you did it but you two.

As you can see I don [sic] know where you live. I also know where your kids go to school. By the way have you been out of town, it seems pretty quite [sic] at your house. As you can see if I wanted to hurt your kids, I could have done it while you were away. This is not the point, I want you to challenge yourself and do things that you might not do otherwise. Can you handle that or will you have a nervous brake down [sic]? Lets see if you have it in you, you really have no choice.

(*Id.*) And in a letter addressed exclusively to Jacobson, Control Freak wrote:

I want you both to know what is at stake here. This is no idol threat [sic]. I don't want to hurt anyone physically. I understand that this might be hurting you or the Sheriff emotionally but this is the point (at least in your case). . . .

I know you are not the strongest person emotionally and really don't like to really step out of the box or norm. I am kind of shocked that you decided to go along with this plan. I figured you would crumble and hide in the pathetic shell of yours. . . .

(*Id.*)

In emails and text messages, Jacobson and Duncan discussed whether to comply with Control Freak's demands.[3] (*See id.*, Exs. 10, 12-13.) At times, Duncan downplayed Control Freak's threats. (*See, e.g.*, *id.*, Ex. 12 ("I really don't think he wants to hurt anyone, I think he wants to control US now. I do think this guy is crazy and could do anything but

---

[3] Duncan testified that he used his work cellphone to send text messages to Jacobson. (Duncan Dep. at 56.)

he is smart.").) But, at least initially, Duncan attempted to convince Jacobson that complying with Control Freak's demands was the best course. In an October 30 email, he wrote:

> So are you agreeing we have to go forward or do you want to stop now. I think we have to either stop it now or go with the plan and if we have to be prepared to carry whatever is planned. It makes no sense to go with it and then stop and be back at the same point we are now. I am for the later [sic] because I think this will stop but I am not going to force you to do anything you don't want to. I just think we don't have a choice but I am with any decision you make. . . .
>
> Yes, he has us now because there are just too many variables (using analyst terms :) ) and too may [sic] moving parts. I just think we have to do it and then if he does not keep his promise then come up with other options. This will not jeopardize our current relationship, I won't let that happen. Remember he can make us act like we are in love with each other but he can not make us love each other and that is why this will not jeopardize our current relationship.
>
> If you can't or won't even considering [sic] having sex (yes I threw it out there) then I think we should just not do anything. There might be a way (him not knowing what we do) but I think we have to be prepared if he does have a way to know. Are you willing to go through with it? . . .

(*Id.*, Ex. 13.)

Jacobson testified that, while exchanging emails with Duncan on October 30, she deduced that Duncan wrote the Control Freak letters in an effort to sleep with her. (*Id.*, Ex. 4 ("Jacobson Dep."), at 96-99.) But she struggled with that conclusion because "what I know of him from what my experience with him is, he wouldn't do this." (*Id.* at 98-100.) Jacobson explained: "This is just plain crazy. And I struggled with on one hand I have the Sheriff who I at that time trusted and believed wouldn't cause me any harm or I have a Control Freak that wants me to do this and wants to cause me and my family harm." (*Id.* at

99.) Because of that conflict, Jacobson had lingering concerns that Control Freak was in fact a malicious third party. (*Id.* at 103-04.)

By November 2, 2017, when Jacobson returned to the office, Jacobson decided not to follow Control Freak's plan. (*Id.* at 104-08.) When Jacobson informed Duncan of her decision, he tried to change her mind, and alluded to her children's vulnerability.[4] (*Id.* at 104.) In the following week, Duncan continued the Control Freak charade, telling Jacobson that he had received a "FU" letter from Control Freak and claiming that his work computer and phone had been hacked. (*Id.* at 109-12; Lienemann Decl., Ex. 18.) Jacobson last discussed Control Freak with Duncan on November 6, 2017. (*See* Jacobson Dep. at 115.) Thereafter, Jacobson developed a "safety plan," which included leaving the door open during meetings with Duncan and avoiding being alone with him. (*Id.* at 147-48.)

Duncan admits that he was the author of the Control Freak letters. (Duncan's Am. Answer ¶ 21; Lienemann Decl., Ex. 20.) At his deposition, he testified that he orchestrated the Control Freak scheme in order to manufacture a crisis that he could solve, and thereby feel like a "hero." (Duncan Dep. at 37, 44, 52, 77-79.) He testified that he did not intend for his actions to be discovered, and took steps to conceal them—including by shredding the first Control Freak letter and discouraging Jacobson from discussing the letters with others. (*Id.* at 42-43, 52, 86-87.) Duncan chose a Sheriff's Office employee as the object

---

[4] Duncan referenced her daughter's Facebook page, which indicated that she worked at a Culver's restaurant, and advised that Jacobson should be more cautious about sharing such information online. (*Id.* at 108-09.) Jacobson testified: "And I thought, You're trying to -- I felt, You're trying to scare me." (*Id.* at 109.)

of his scheme, as opposed to a member of the public, because he "had control of the sheriff's office in a sense. I had control of that environment." (*Id.* at 38.) He chose Jacobson because her role at the Sheriff's Office required her to meet with him on a weekly basis— "out of all . . . the support techs in the agency, I worked more closely with Michelle." (*Id.* at 37.) Duncan testified that he did not intend to frighten Jacobson, and he intended to "solve" the Control Freak scenario before acting on Control Freak's demands or threats. (*Id.* at 44, 77-79.) However, he also testified that he understood that in order to create the desired crisis, he would have to cause Jacobson some emotional harm. (*Id.* at 79.) Duncan admitted that he intended to make Jacobson believe her spouse and children were in danger and that she was being watched, and he understood that a person thus threatened would be fearful. (*Id.* at 44, 73, 76, 79, 81.)

Jacobson reported the matter to Sergeant Justin Wood, her immediate supervisor, on November 20, 2017. (Jacobson Dep. at 114-18, 125.) Jacobson testified that, initially, Wood did not seem to believe her; but when she showed him Duncan's messages, he told her that they needed to inform Chisago's human resources department. (*Id.* at 118.) But Jacobson told Wood that she did not want to file a complaint with human resources, and that she would deny having made the allegations if Wood filed a complaint without her. (*Id.* at 118-19.) Jacobson testified that she was reluctant to inform human resources because she was looking for work elsewhere, and feared the personal and professional harm that might come from Duncan learning that she knew he was behind the letters. (*Id.* at 119-20, 124.) In addition, Jacobson testified that she did not trust the human resources personnel, and specifically referenced another employee—Tracy Armistead—who had filed a sexual

harassment complaint against a county administrator, which was "just brushed under the rug." (*Id.* at 119-20, 123.) Wood acquiesced, but continued to ask about Jacobson's well-being and encourage her to report the matter in the following weeks. (*Id.* at 124.) On January 8, 2018, Jacobson confided in Tracy Armistead, an employee of Chisago, who also encouraged Jacobson to report the matter to human resources. (*Id.* at 127.) Armistead, however, was also sympathetic to Jacobson's concern that Duncan would retaliate against her—though, like Wood, Armistead pressured Jacobson to inform human resources. (*Id.* at 135-37, 158.)

Jacobson did not file a complaint with Chisago's human resources department until March 2, 2018, after she had learned that her application for another job was unsuccessful. (*Id.* at 156-58.) Chisago then hired an outside investigator, whose April 26, 2018 report concluded that "Sheriff Duncan's actions constitute an abhorrent and shocking violation of the standard of conduct expected of a department head, a law enforcement officer, an elected Sheriff, an employee of Chisago County, a supervisor, and a community leader. . . . Sheriff Duncan engaged in sexual harassment of Jacobson by making unwelcome sexual advances, albeit under an alias . . . while simultaneously engaging in discussions with Jacobson about increasing the pay for her position at Chisago County." (Lienemann Decl., Ex. 8, at 5.) Duncan declined to be interviewed for the investigation. (*Id.* at 19.) In an effort to prevent the investigator's report from being made public, Duncan announced his retirement, effective May 4, 2018. (Duncan Dep. at 134-35.)

Jacobson was placed on paid administrative leave during the county's investigation. (*See* Jacobson Dep. at 183.) Chisago notified her that Duncan would resign on May 4, and

that she could therefore return to work on May 7; but Jacobson refused to return to work because she had not yet received a copy of the investigator's report confirming that Duncan was in fact Control Freak, and because Duncan's son continued to serve as a deputy for the Chisago County Sheriff's Office. (*Id.* at 180-83.) Jacobson instead took personal leave, beginning May 4, until she obtained employment at the Federal Reserve in late May or early June 2018. (*Id.* at 181-84.)

Jacobson asserts that Duncan's actions caused her severe emotional anguish, including fear for her safety and the safety of her children; fear for her job; feelings of revulsion, disbelief, horror, confusion, and distrust; and fear of retaliation. (Lienemann Decl., Exs. 22-25.) Jacobson's distress has manifested in physical symptoms, such as crying, shaking, sleeplessness, and nervousness. (*Id.*) She was diagnosed with post-traumatic stress disorder, and has received mental health counseling since February 2018. (*Id.*, Ex. 22.) Because of her fear of Duncan, Jacobson and her husband sold their home and relocated to another county, requiring their children to change schools. (*Id.*, Exs. 23-25.)

Jacobson brought this suit against Duncan and Chisago (collectively, "Defendants"). Jacobson alleges that Chisago is liable for sexual harassment under the Minnesota Human Rights Act ("MHRA"); that Duncan is liable for the deprivation of her equal protection rights under 42 U.S.C. § 1983, and for intentional infliction of emotional distress under Minnesota law; and that Chisago is vicariously liable for intentional infliction of emotional distress. (*See generally* Compl.)

After Jacobson filed this lawsuit, Duncan sought indemnity and a defense from Chisago. The Chisago County Board of Commissioners denied that request. (Aff. of Cally Kjellberg-Nelson ("Kjellberg-Nelson Aff.") [Doc. No. 108], Ex. B.) And the Minnesota Court of Appeals affirmed Chisago's decision. *See Duncan v. Cty. of Chisago*, No. A18-1775, 2019 WL 2571711, at *5 (Minn. Ct. App. June 24, 2019). On October 22, 2020, Duncan pleaded guilty to stalking and misconduct of a public officer. (Kjellberg-Nelson Aff., Ex. N.)

Jacobson now moves for summary judgment on Defendants' liability. (Pl.'s Mot. for Partial Summ. J. [Doc. No. 97].) Chisago likewise moves for summary judgment on all claims against the county. (Chisago's Cross-Mot. for Summ. J. [Doc. No. 105].) In response to Jacobson's motion, Duncan asserts that genuine factual disputes preclude summary judgment on Jacobson's § 1983 and intentional infliction of emotional distress claims. (Duncan's Mem. in Opp'n to Pl.'s Mot. for Summ. J. [Doc. No. 111].)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence

and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where, as here, the record is largely undisputed and "the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (citing *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir. 1990)).

### B. Chisago's Liability Under the Minnesota Human Rights Act

The Court begins its analysis with Jacobson's MHRA claim against Chisago. Under the MHRA, sexual harassment is a prohibited unfair discriminatory employment practice. *See* Minn. Stat. §§ 363A.03, subd. 43; 363A.08. Chisago does not dispute that Duncan's conduct qualifies as sexual harassment. (*See* Mem. in Supp. of Chisago's Mot. for Summ. J. [Doc. No. 107], at 18-23.) Rather, the parties dispute whether Chisago is liable for Duncan's misconduct.

As an initial matter, the Court must determine whether to analyze Chisago's liability under the rubric applicable in cases where an employer's supervisory employee sexually harasses a subordinate, or that applicable where harassment is perpetrated by a non-employee third party. Chisago contends that because Duncan was an elected official, and the county therefore could not directly terminate his employment, Duncan is properly considered a non-employee third party. The Minnesota Supreme Court has adopted the Equal Employment Opportunity Commission's ("EEOC") "expansive" view of which individuals within an employer's organization constitute a "supervisor" for employment discrimination purposes. *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 572–73 (Minn. 2008). Under the EEOC's standard, "an individual qualifies as an employee's supervisor if the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or* the individual has authority to direct the employee's daily work activities." *Id.* at 572 (quotation omitted).

The record in this case demonstrates that Duncan qualifies as a supervisor under the EEOC standard. As to the first prong of the test, an elected sheriff is generally empowered by statute to hire and fire Sheriff's Office employees. *See* Minn. Stat. § 387.14 ("The sheriff shall appoint in writing the deputies and other employees, for whose acts the sheriff shall be responsible and whom the sheriff may remove at pleasure."). To be sure, Duncan testified that he believed he was required to submit hiring and firing recommendations to Chisago, and that the final decision rested with the county. (Duncan Dep. at 23-25, 150-56.) Even if Duncan's belief were correct, however, he also testified that the county had never rejected his hiring recommendations. (*Id.* at 154.) Under the MHRA, "an employee

should be considered a supervisor even if he or she does not have the final say in making tangible employment decisions if the individual's recommendation is given substantial weight by the final decisionmaker(s)." *Frieler*, 751 N.W.2d at 572 (quotation omitted). With respect to the second prong of the EEOC test, the record demonstrates that Duncan held "authority to direct [Jacobson's] daily work activities." *Id.* Duncan was Jacobson's highest-level supervisor, and her only other supervisor was Sergeant Wood; Chisago did not supervise or direct her work. (Duncan Dep. at 23-24, 150; Jacobson Dep. at 125; Compl. ¶ 10.) Thus, under either prong of the EEOC test, the record demonstrates that Duncan qualifies as Jacobson's supervisor.

It is true that Chisago could not directly fire Duncan. Although Chisago makes much of this fact, it does not adequately acknowledge the various "soft" powers it wields over its elected sheriff. Most notably, Chisago is empowered to investigate the conduct of its elected sheriff, and publicize its findings. Here, Chisago did exactly that: the county hired an outside investigator, who confirmed Jacobson's allegations against Duncan. (*See* Lienemann Decl., Ex. 8, at 5.) In an attempt to prevent Chisago from publicly releasing the investigator's report, Duncan resigned. (Duncan Dep. at 134-35.) Because Chisago's investigative power directly led to the resignation of its elected sheriff in this case, Chisago's assertion that it is powerless to discipline its elected sheriff rings hollow.[5]

---

[5] *Cf. Meadows v. Guptill*, 856 F. Supp. 1362, 1371 n.5 (D. Ariz. 1993) ("The Town argued . . . that it could not be held liable for Guptill's actions because Guptill was an elected official, and the Town had no authority to discipline him. The court rejected this argument, holding that Title VII imposed a duty on the Town to at least try to alleviate the situation, even if there was no guarantee the Town could be successful.").

Regardless, in determining whether an individual is a "supervisor" under the MHRA, the Minnesota Supreme Court looks to the alleged supervisor's control over the employee— not necessarily to the employer's control over the alleged supervisor. *See Frieler*, 751 N.W.2d at 572–73.

Therefore, the Court finds that Chisago's liability must be analyzed under the framework applicable to an employer's liability for harassment perpetrated by a supervisor. Generally, the MHRA does not render an employer strictly liable for its supervisor's misconduct. *Id.* at 568 ("We . . . reject Frieler's argument that strict liability is the standard to be applied in sexual harassment cases . . . ."). Instead, the Minnesota Supreme Court has adopted the *Faragher/Ellerth* standard, under which "an employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over a victimized employee." *Id.* at 570. Where the harassment does not culminate in a tangible employment action, "the employer may raise an affirmative defense to liability or damages if it proves by a preponderance of the evidence: (1) 'that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (2) 'that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* at 570–71 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). An employer cannot invoke the *Faragher/Ellerth* affirmative defense—and vicarious liability therefore attaches automatically—"when the supervisor harassment 'culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment.'" *Id.* at 571 (citing *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765).

Additionally, federal courts have read *Faragher* as recognizing the rule that the *Faragher/Ellerth* defense is unavailable where the supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Faragher*, 524 U.S. at 789; *see, e.g.*, *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 52 (2d Cir. 2012) ("Every Court of Appeals to have considered this issue has held that the *Faragher/Ellerth* affirmative defense is unavailable when the supervisor in question is the employer's proxy or alter ego." (collecting cases from the Fifth, Seventh, and Ninth Circuits)). Although the Minnesota Supreme Court has not yet addressed the proxy theory's application to MHRA claims, the Minnesota Court of Appeals—albeit in an unpublished opinion and without analysis—has recognized the theory. *Kaufenberg v. Winkley Co.*, No. A14-1514, 2015 WL 3539744, at *4 (Minn. Ct. App. June 8, 2015) (unpublished op.) ("[T]he *Faragher/Ellerth* affirmative defense is unavailable when the harrassing [sic] supervisor is the employer's proxy or alter ego.").

In this case, the parties—as well as the Minnesota Department of Human Rights and the Association of Minnesota Counties, appearing as amici curiae—contest whether the proxy theory applies under the MHRA. Jacobson and the Department urge the Court to recognize the theory and find that Duncan acted as the county's proxy, thereby depriving Chisago of the *Faragher/Ellerth* affirmative defense. Additionally, Jacobson argues that she was constructively discharged, obviating the defense.

The Court need not consider whether the Minnesota Supreme Court would recognize the proxy theory under the MHRA, or whether Jacobson was constructively discharged, because it finds that Chisago has not raised a triable issue regarding the *Faragher/Ellerth* defense. The defense comprises "two necessary elements," namely: (1) that the employer exercised reasonable care to prevent and correct harassment; and (2) that the plaintiff unreasonably failed to avail herself of the preventive and corrective procedures offered by the employer. *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007). In this case, Chisago cannot establish that Jacobson **unreasonably** failed to take advantage of the county's harassment reporting procedures.

The record is devoid of any evidence that Jacobson acted unreasonably. She reported Duncan's behavior to Sergeant Wood, her immediate supervisor, fairly promptly. Although she asked Wood not to relay her report to Chisago's human resources department until she found a new job, it appears undisputed that Jacobson's hesitation to escalate her complaint was not "unreasonable." It is undisputed that Jacobson's reluctance to permit Wood to file a report was fueled by Duncan's threats (under the guise of "Control Freak") against her children, as well as Jacobson's understanding that a past sexual harassment complaint filed by another employee was "brushed under the rug." (Jacobson Dep. at 118-20, 124.) And perhaps most importantly, Sergeant Wood himself testified that he believed Jacobson's fear of retaliation was reasonable, and that he was similarly afraid of retaliation by Duncan. (Lienemann Decl., Ex. 6, at 51-55.)

Rather than dispute the reasonableness of Jacobson's conduct, which is not possible on this record, Chisago urges the Court to apply the rule articulated in *McCurdy v. Arkansas*

*State Police*, 375 F.3d 762 (8th Cir. 2004). There, the Eighth Circuit held that an employer need not prove the second prong of the *Faragher/Ellerth* defense where the alleged harassment is limited to a single incident, and the employer takes "swift and effective action to avoid further offensive conduct." *Id.* at 772. The Minnesota Supreme Court has neither accepted nor rejected *McCurdy's* alteration of the *Faragher/Ellerth* framework under the MHRA.

This Court need not consider whether the Minnesota Supreme Court would adopt the *McCurdy* rule, because *McCurdy* is readily distinguishable on the facts of this case. In *McCurdy*, the Eighth Circuit considered a single incident of harassment, which was quickly reported to and addressed by the employer. There, a supervisor touched the plaintiff's breast and made crass comments to her on a single occasion, she reported the conduct, and the employer took swift disciplinary action. *Id.* at 764–65. The Eighth Circuit reasoned that, where an employee promptly reports a single incident of harassment and the employer swiftly addresses it, an employer *cannot* establish the second prong of the *Faragher/Ellerth* affirmative defense. *Id.* at 772. The result is, effectively, strict liability in single-incident cases. *Id.*

However, the instant case does not involve a single incident of harassment. Rather, Duncan's misconduct spanned multiple letters, emails, and text messages exchanged over the course of two weeks. Moreover, when Jacobson reported the incident to Sergeant Wood, Wood acquiesced in Jacobson's request not to escalate the report out of fear of Duncan. Thus, Chisago did not take the same "swift and effective" corrective action as the employer in *McCurdy*. *McCurdy* is, therefore, inapplicable. *Cf. Williams v. Missouri Dep't*

*of Mental Health*, 407 F.3d 972, 978 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester* (8th Cir. June 1, 2011) (distinguishing *McCurdy* in a case that did not "involve a single, severe, unanticipated act of sexual harassment").

Without the benefit of *McCurdy*, Chisago cannot establish the second prong of the *Faragher/Ellerth* defense.[6] Accordingly, the Court finds that Chisago is vicariously liable for Duncan's harassment. The Court therefore grants Jacobson's Motion for Partial Summary Judgment, and denies Chisago's Cross-Motion for Summary Judgment, with respect to Jacobson's MHRA claim.

### C. Intentional Infliction of Emotional Distress

Next, the Court considers Jacobson's claim for intentional infliction of emotional distress against both Defendants. Although Chisago's motion appears to treat the Complaint as alleging that Chisago is both vicariously and directly liability for this tort, Jacobson does not allege that Chisago's own conduct is independently tortious under this doctrine. Rather, Jacobson asserts that Duncan is directly liable for intentional infliction of emotional distress and that Chisago, as his employer, is vicariously liable.

Under Minnesota law, the tort of intentional infliction of emotional distress has four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be

---

[6] Because the Court finds that the record would not permit a reasonable jury to conclude that Jacobson unreasonably failed to avail herself of Chisago's anti-harassment policy, the Court need not determine whether Chisago exercised reasonable care in preventing and correcting sexual harassment.

severe." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983). Duncan argues that fact issues regarding the "extreme and outrageous" and "severe distress" elements preclude summary judgment in Jacobson's favor.

Conduct is "extreme and outrageous" if it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* at 439 (quotation omitted). The Court finds that Duncan's dark masquerade as "Control Freak" was extreme and outrageous as a matter of law. As part of his scheme, Duncan—an elected sheriff—pretended to be an anonymous criminal, and repeatedly threatened to harm Jacobson's children if she did not follow a detailed plan culminating in an affair with Duncan. Although Duncan notes that the conduct was limited to a two-week timeframe, and that Jacobson had previously maintained a good working relationship with him, these facts do not create a genuine fact dispute on this element. Duncan's conduct throughout the course of the Control Freak scheme, for which he was criminally charged and to which he pled guilty, was "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community," and the Court finds that no reasonable jury could conclude otherwise.[7]

Duncan also disputes whether he caused Jacobson "severe" distress. But Duncan does not identify any specific facts in dispute in the record regarding the severity of Jacobson's distress; rather, he argues only that "the trier of fact must be allowed to assess

---

[7] Notably, Duncan testified that the Control Freak scenario he created was so abhorrent that it made *himself* physically ill. (Duncan Dep. at 94-95.)

Plaintiff's credibility as a witness in light of all the relevant facts and considerations . . . ." (Duncan's Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 8.) A party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). Ample record evidence supports the conclusion that Jacobson's distress was severe. As a result of her distress, Jacobson relocated her family to another county—requiring her children to change schools; she has been diagnosed with post-traumatic stress disorder, and has received counseling since January 2018; and her distress has manifested in physical symptoms and affected her family life, as detailed in declarations submitted by Jacobson, her husband, and her daughter. (*See* Lienemann Decl., Exs. 22-25.) Against this evidence, Duncan's bare challenge to Jacobson's credibility does not create a genuine factual dispute.

Thus, the Court finds that there is no genuine factual dispute, and Jacobson is entitled to judgment as a matter of law on her intentional infliction of emotional distress claim against Duncan.

However, the Court finds that Chisago is immune from vicarious liability for Duncan's conduct. Minnesota's Municipal Tort Claims Act imposes liability on counties for the torts of county officers where those officers act "within the scope of their employment or duties." Minn. Stat. § 466.02. The Act provides counties with immunity from several types of claims, including claims that, if brought against the state, would be subject to the immunities provided in the State Tort Claims Act. *Id.* § 466.03, subd. 15. Under the State Tort Claims Act, the state is liable "for injury . . . caused by an act or

omission of an employee of the state while acting within the scope of office or employment," subject to several exclusions not relevant here. *Id.* § 3.736, subd. 1. Although the Municipal Tort Claims Act does not define "scope of office or employment," the State Tort Claims Act provides that the term means "that the employee was acting on behalf of the state in the performance of duties or tasks lawfully assigned by competent authority." *Id.* §§ 3.732, subd. 1(3); 466.01.

In *Doe 175 ex rel. Doe 175 v. Columbia Heights School District*, the Minnesota Court of Appeals examined this interplay between the State and Municipal Tort Claims Acts. 873 N.W.2d 352 (Minn. Ct. App. 2016). There, the plaintiff was a student who alleged that the defendant school district was vicariously liable for a sexual battery committed by its employee. *Id.* at 355–56. The court held that the school district was immune from liability under § 466.03, subdivision 15. *Id.* at 357–59. It reasoned that the State Tort Claims Act "plainly excludes from vicarious liability torts committed by a state employee who was *not* 'acting on behalf of the state in the performance of duties or tasks lawfully assigned by competent authority.'" *Id.* at 358 (citation omitted). By cross-referencing the State Tort Claims Act, § 466.03, subdivision 15 incorporates that immunity. *Id.* Thus, the court reasoned:

> There is no dispute that Warnke engaged in sexual misconduct for his own personal reasons, not "on behalf of" the school district "in the performance of duties or tasks lawfully assigned by competent authority." *See* Minn. Stat. § 3.732, subd. 1(3). Therefore, if Warnke had been employed by the state rather than the school district, Doe's vicarious liability claim would have been "excluded under section 3.736." *See* Minn. Stat. § 466.03, subd. 15. Thus, . . . the district court correctly concluded that the school district was immune from liability under section 466.03, subdivision 15.

*Id.*

The Court finds *Doe* persuasive, and concludes that Chisago is immune from liability under § 466.03, subdivision 15. As in *Doe*, Duncan's actions were taken to gratify his own desires, rather than "in the performance of duties or tasks lawfully assigned by competent authority" to the county sheriff.[8] (*See* Duncan Dep. at 37, 44, 52, 77-79.) This conclusion is bolstered by the Court of Appeals' holding that Duncan was not "acting in the performance of the duties of [his] position" for purposes of the Municipal Tort Claims Act's indemnity and defense obligations. *See Duncan v. Cty. of Chisago*, No. A18-1775, 2019 WL 2571711, at *4–5 (Minn. Ct. App. June 24, 2019). Because Duncan was not acting "in the performance of duties or tasks lawfully assigned by competent authority," Jacobson's vicarious liability claim would be barred by the State Tort Claims Act were he a state employee. *See* Minn. Stat. § 3.736, subd. 1; *Doe 175*, 873 N.W.2d at 358. Consequently, Chisago is entitled to immunity under Minnesota Statutes § 466.03, subdivision 15.

In sum, the Court finds that Jacobson is entitled to summary judgment as to Duncan's liability for intentional infliction of emotional distress. But Chisago cannot be

---

[8] Jacobson argues that the State Tort Claims Act's narrow definition of "scope of office or employment" does not apply to her claim against the county, and urges the Court to instead apply the broader common law "scope of employment" standard. (Mem. in Opp'n to Chisago's Mot. for Summ. J. [Doc. No. 114], at 29-30.) But Jacobson does not address the textual analysis in *Doe*, which the Court finds persuasive. Thus, the Court applies the narrow definition of "scope of office or employment" provided by the statute, rather than the broader common law "scope of employment" standards advanced by Jacobson.

held vicariously liable for that tort under the Municipal Tort Claims Act. Accordingly, the Court grants in part and denies in part Jacobson's motion as to this claim, and grants Chisago's motion with respect to this claim.

### D.    Duncan's Liability Under 42 U.S.C. § 1983

Finally, the Court considers Jacobson's § 1983 claim against Duncan.[9] Section 1983 imposes liability for the deprivation of a plaintiff's rights by a person acting under color of state law. 42 U.S.C. § 1983. Duncan does not dispute that his actions deprived Jacobson of her rights, but contends that a triable issue of fact exists concerning whether he acted under color of state law. Duncan relies heavily on the Minnesota Court of Appeals' decision holding that Chisago is not statutorily required to indemnify and defend him. In addition, Duncan notes that he wrote the Control Freak letters pseudonymously in an attempt to hide his identity as a law enforcement officer.

But the Court of Appeals' decision does not speak to the color of law inquiry. In holding that Chisago is not required to indemnify and defend Duncan, the Court of Appeals applied the Municipal Tort Claims Act, which requires Chisago to

> defend and indemnify any of its officers and employees, whether elective or appointive, for damages, including punitive damages, claimed or levied against the officer or employee, provided that the officer or employee:
>
> (1) was acting in the performance of the duties of the position; and

---

[9] The Court notes that Chisago's motion seeks a judgment that the county is not liable under § 1983. (Mem. in Supp. of Chisago's Mot. for Summ. J. at 17-18.) Jacobson does not assert a § 1983 or *Monell* claim against Chisago; Jacobson's § 1983 claim is pleaded solely against Duncan. (*See* Compl., Count III.)

> (2) was not guilty of malfeasance in office, willful neglect of duty, or bad
> faith.

Minn. Stat. § 466.07, subd. 1. The Court of Appeals affirmed Chisago's finding that Duncan was not "acting in the performance of the duties" statutorily assigned to county sheriffs. *Duncan v. Cty. of Chisago*, No. A18-1775, 2019 WL 2571711, at *3–5 (Minn. Ct. App. June 24, 2019).

The "performance of duties" inquiry conducted by the Court of Appeals is not the same as the "color of law" inquiry required under § 1983. Applying Minnesota Statutes § 466.07, the Court of Appeals analyzed whether "Duncan was 'acting' (as in, taking some action or engaging in some conduct) 'in the performance of the duties of the position' (as in, while fulfilling some requirement and expectation of a sheriff)." *Id.* at *3. By contrast, the color of law inquiry asks whether a public official "misuses power possessed by virtue of . . . law and made possible only because he was clothed with the authority of . . . law." *Peyro v. Holder*, 574 F.3d 893, 900–01 (8th Cir. 2009) (quotation omitted).

Applying the "color of law" test, the Court finds that Jacobson is entitled to summary judgment on her § 1983 claim. "[T]o find whether an official acts under color of law, [courts] look to see whether a sufficient nexus exists between the official's public position and the official's harmful conduct." *Id.* (citation omitted). The nexus inquiry "is necessarily fact intensive, and, in the context of police officers, includes considerations such as whether the officers are on duty and in uniform, the motivation behind the officers' actions, and whether the officers had access to the victim because of their positions, among others." *Id.* at 901 (citations omitted).

Each of the factors identified in *Ramirez-Peyro* is present on this record. When he initiated his scheme, Duncan wore his badge and uniform, and called Jacobson into his office to discuss her pay. (Compl. ¶ 13; Duncan Dep. at 74-75.) He testified that he was motivated by his desire to feel like a "hero," a desire prompted by his dissatisfaction with his position's focus on administration rather than policing. (Duncan Dep. at 37, 44, 52, 77-79.) And he chose Jacobson specifically because his position gave him control over her environment and ready access to her. (*Id.* at 38.) Although Duncan unsuccessfully endeavored to conceal the fact that he was "Control Freak," much of Duncan's scheme depended on Jacobson deferring to his analysis—as sheriff—of how to resolve the Control Freak "crisis." (*See, e.g.*, Lienemann Decl., Exs. 12-19.) And Duncan purported to exercise the powers of his position to "protect" Jacobson; for example, Duncan claimed to have obtained a fingerprint analysis of the first Control Freak letter, and he pretended to assign an additional patrol to Jacobson's house. (Compl. ¶ 19; Duncan's Am. Answer ¶ 8; Duncan Dep. at 47.) Finally, Duncan was convicted of misconduct of a public officer, a crime applicable where a public officer, in his official capacity, knowingly acts "in excess of lawful authority or knowing [the act] is forbidden by law to be done in that capacity."[10] Minn. Stat. § 609.43, subd. 2; Kjellberg-Nelson Aff., Ex. N, at 22.

---

[10] The Court notes that Duncan's conviction under Minnesota Statutes § 609.43, subdivision 2 is consistent with the Court's finding that Chisago is immune from liability on Jacobson's intentional infliction of emotional distress claim. Duncan's conviction required proof that, acting in his official capacity, he either acted in excess of his lawful authority or he performed an act forbidden by law. Chisago's immunity is premised on the conclusion that Duncan was not acting "in the performance of duties or tasks lawfully assigned by competent authority" to the county sheriff. Minn. Stat. § 3.732, subd. 1(3). When Duncan executed the "Control Freak" scheme, using his position as sheriff to

On this record, the Court finds that no reasonable jury could conclude that Duncan was not acting under color of law, and the Court therefore grants Jacobson's Motion for Partial Summary Judgment as to her § 1983 claim.

## III. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 97] is **GRANTED in part** and **DENIED in part**, as follows:

   a. The motion is **GRANTED** as to Plaintiff's Minnesota Human Rights Act claim against Defendant County of Chisago, and as to Plaintiff's intentional infliction of emotional distress and 42 U.S.C. § 1983 claims against Defendant Richard Duncan; and

   b. The motion is **DENIED** as to Plaintiff's intentional infliction of emotional distress claim against Defendant County of Chisago; and

2. Defendant County of Chisago's Cross-Motion for Summary Judgment [Doc. No. 105] is **GRANTED in part** and **DENIED in part**, as follows:

---

advance that scheme, he performed an action "in excess of [his] lawful authority" or "forbidden by law," yet that action was not taken "in the performance of [his] duties or tasks lawfully assigned" to the county sheriff. Thus, Duncan was convicted of misconduct of a public officer, supporting the conclusion that his conduct was "under color of law" for purposes of liability under § 1983. But because his conduct under color of law and in excess of his lawful authority was not taken "in the performance of duties" assigned to the sheriff, the Municipal Tort Claims Act bars Jacobson's vicarious liability claim against Chisago for intentional infliction of emotional distress.

a. The motion is **GRANTED** as to Plaintiff's intentional infliction of emotional distress claim against Defendant County of Chisago; and

b. The motion is **DENIED** as to Plaintiff's Minnesota Human Rights Act claim against Defendant County of Chisago.

3. The parties are ordered to schedule a final settlement conference in this case before Magistrate Judge Bowbeer. This matter will go to trial on January 18, 2022, and a more detailed order will follow.

**IT IS SO ORDERED.**

Dated: July 15, 2021                                    s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge